# EXHIBIT B

FILED
DISTRICT CLERK OF
JEFFERSON CO TEXAS
7/3/2018 9:09 AM
JAMIE SMITH
DISTRICT CLERK
B-202016

CASE NO. _____

| | | |
|---|---|---|
| BAPTIST HOSPITALS OF SOUTHEAST TEXAS, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | JEFFERSON COUNTY, TEXAS |
| AETNA HEALTH INC. | § § | |
| Defendant. | § § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND MOTION FOR EXPEDITED DISCOVERY

This case involves a national health insurance company breaching its contract with local non-profit hospitals by attempting to recoup over $2,500,000 that was paid to the hospitals for health care provided to the insurance company's members; a recoupment that, unless enjoined, would significantly harm the hospitals' daily operations as a non-profit organization.

## I. SUMMARY OF THE ACTION

1.    Aetna Health, Inc. ("Aetna") wrongly claims that it has overpaid Baptist Hospitals of Southeast Texas ("Baptist Hospitals") for high-cost drugs and implants that the hospitals provided to Aetna's insureds from January 1, 2014 through the present. Aetna's position ignores the rate schedule in the parties' contract and is inconsistent with the parties' contractual negotiations and course of performance. Aetna has paid Baptist Hospitals for high-cost drugs and implants the same way since at least February 2004—based on a flat percentage of billed charges—without ever requesting a refund for an alleged "overpayment." The overpayment theory was manufactured by auditors that Aetna hired, Cotiviti Healthcare ("Cotiviti") and OmniClaim, angling for a portion of any extorted "refund" based on a gross misreading of the contract—one that was never previously discussed or adopted by any of the parties.

2.     Aetna has recently demanded that Baptist Hospitals "refund" alleged overpayments in the amount of $2,644,903.72. In mid-June of 2018, after ignoring Baptist Hospitals' requests for a meeting to discuss these issues, Aetna began recouping the alleged "overpayments" by withholding payments to Baptist Hospitals for healthcare services provided by Baptist Hospitals to Aetna's insureds, as a purported "offset" until the full amount is recouped.

3.     Baptist Hospitals seeks a temporary restraining order and temporary injunction to prohibit Aetna from recouping funds that were properly paid pursuant to the parties' contract.

4.     Aetna's actions will cause immediate and irreparable harm to Baptist Hospitals' daily operations as a non-profit organization. In contrast, Aetna has a market capitalization of over $43 billion and will not be substantially harmed by the requested restraining order and injunction, which maintains the status quo.

5.     Accordingly, temporary injunctive relief is warranted to preserve the status quo until Aetna's (or Cotiviti's or OmniClaim's) new interpretation of the parties' contract has been rejected on the merits.

## II. PARTIES

6.     Plaintiff Baptist Hospitals of Southeast Texas is a Texas corporation with its principal place of business in Beaumont, Jefferson County, Texas. Baptist Hospitals can be notified through its attorneys, Smyser Kaplan & Veselka, LLP (attn: Jeff Potts and Jarod Stewart), 700 Louisiana, Suite 2300, Houston, Texas, 77002.

7.     Defendant Aetna Health Inc. is a Texas corporation doing business in Texas. Service can be made on Aetna by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

### III. JURISDICTION, VENUE, AND DISCOVERY LEVEL

8.     This Court has jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

9.     This is a dispute over the rate of payment under a contract between a healthcare provider and an insurance company. It is not a claim for benefits under ERISA. Therefore, this case is not removable to federal court under the rule set forth in *Lone Star OB/GYN Associates v. Aetna Health Inc.*, 579 F.3d 525 (5th Cir. 2009) and its progeny. Nor is the case removable to federal court under 28 U.S.C. § 1332 because there is no diversity, given that Baptist Hospitals and Aetna are both Texas corporations.

10.     Venue is appropriate because the contract was executed here, a substantial part of the acts and omissions giving rise to the claims occurred in Jefferson County, and Baptist Hospitals is located and conducts business within Jefferson County.

11.     Baptist Hospitals intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

### IV. FACTS

12.     The facts stated below are supported and verified by the Affidavit of Roy Bush, attached as Exhibit 1.

13.     Aetna is one of the nation's largest health insurers and one of the largest insurers in the East Texas health insurance market. Thousands of its insureds receive treatment at area facilities, including the Baptist Hospitals in Beaumont and Orange. Aetna negotiates reimbursement rates with various health care providers, such as Baptist Hospitals, to pay them for treatment of Aetna insureds at rates typically less than the normal billed charges. Aetna obtains these discounts because of the volume of its patients. These discounted rates are

3

memorialized in contracts with the health care providers. These contracts are heavily negotiated and frequently revised.

**A. Based on Baptist Hospitals' Affiliation with Memorial Hermann, Aetna Pays Baptist Hospitals at the Memorial Hermann Contract Rates from February 1, 2004 through May 31, 2013—Including ██% of Billed Charges for High-Cost Drugs and Implants.**

14. For many years, the Baptist Hospitals were treated as "participating providers" under Memorial Hermann Health System's managed care contract with Aetna. This treatment was based on the affiliation between the Baptist Hospitals and the Memorial Hermann Hospital System ("Memorial Hermann"), and it meant that Aetna paid Baptist Hospitals at the Memorial Hermann negotiated rates for healthcare services provided to Aetna's insureds. *See* Ex. 1, at ¶ 3.

15. Effective February 1, 2004, Aetna entered into a Hospital Services Agreement with Memorial Hermann, with Baptist Hospitals listed as Participating Providers. The agreement included a "Hospital Services Compensation Schedule" that listed the negotiated and agreed-to payment terms for various healthcare services. There are per-diem Inpatient Rates for intensive care, intermediate care, surgical care, rehabilitation care, etc. There are also Inpatient "Carve Out" Rates for services such as coronary bypass, maternity care, ambulatory surgery, emergency care, radiology services, etc. in which Aetna paid the hospital a specific per-diem rate, case rate, or a rate expressed as a percentage of the billed charges (e.g. X% of billed charges) as an additional rate for specific procedures or services on top of the standard inpatient rates for intensive care, surgical care, etc.

16. Under the Sections "Inpatient Carve Out Rates" and "Outpatient Carve Out Rates," the Compensation Schedule states that Aetna will pay for high-cost drugs and implants as follows, for all products (HMO, PPO, etc.):

| High Cost Drugs | Revenue Codes: 251-252, 636 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |
| Implants/Prosthetics/Orthotics | Revenue Codes: 274, 275, 276, 278 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |

17.    High-cost drugs are defined as drugs with billed charges in excess of $■. Thus, for example, if the billed charge for a particular high-cost drug that was administered to a patient being treated in intensive care was $■, then Aetna would (and did) pay Baptist Hospitals $■ in addition to the per-diem rate for treatment in intensive care and any other applicable negotiated rates. Aetna paid Baptist Hospitals under the Memorial Hermann contracted rates, including a flat ■% of billed charges for high-cost drugs and implants billed under the stated revenue codes, from February 1, 2004 through May 31, 2013.

**B. Baptist Hospitals' Affiliation with Memorial Hermann Ends, Leading to Direct Contract Negotiations Between Baptist Hospitals and Aetna**

18.    In the fall of 2012, Memorial Hermann started negotiating a new managed care contract with Aetna and at the same time, the affiliation between Memorial Hermann and Baptist Hospitals ended. As a result, Baptist Hospitals engaged in direct contract negotiations with Aetna starting in the fall of 2012 over the compensation terms for services provided to Aetna's insureds at Baptist Hospitals going forward. *See* Ex. 1, at ¶ 5. The negotiations were led by Roy Bush and George Hill for Baptist Hospitals and Lucia Herrera and Deborah Restum for Aetna. *See id.*, at ¶ 6.

19.    Aetna sent Baptist Hospitals a proposed new agreement that used a different compensation schedule based on "community hospital" rates, which were much lower than the Memorial Hermann contracted rates. *See* Ex. 1, at ¶ 7. In fact, Aetna's initial proposal did not include any type of carve-out payment for high-cost drugs and implants. When Baptist Hospitals

modeled the projected revenue using the "community hospital" rates proposed by Aetna, it showed a reduction in revenue of approximately $4.8 million for 2013 alone. Ex. 1, at ¶ 7. In late 2012, Baptist Hospitals made clear to Aetna that it would not agree to that reduction and that it "would be willing to sign an agreement in our name at the rates we are currently being reimbursed."

20.     In early 2013, Memorial Hermann signed an agreement that removed Baptist Hospitals from the Memorial Hermann contract with Aetna effective June 1, 2013. Ex. 1, at ¶ 8. This meant that it was in the best interest of both Aetna and Baptist Hospitals to agree upon a direct contract and compensation schedule that would be effective by June 1, 2013—otherwise Baptist Hospitals would become "out of network" with Aetna, causing Aetna's insureds to have to pay more money for their treatment.

21.     Aetna and Baptist Hospitals exchanged several proposed compensation schedules throughout the first few months of 2013. Ex. 1, at ¶¶ 10-12. Each time that Aetna made a proposal, Baptist Hospitals would model that proposal to see how the contract would perform financially using those proposed rates, including the per diems, the case rates, and the rates based on a percentage of billed charges. *Id.*

22.     One proposal that Aetna made was to pay Baptist Hospitals at lower rates across the board, including without limitation a reduction from ██% to ██% of billed charges for high-cost drugs and implants. Ex. 1, at ¶ 12. When Baptist Hospitals modeled that proposal, it showed a reduction in revenue of approximately $2 million for 2013. *Id.* Baptist Hospitals told Aetna that "[w]e are willing to work with you on this but at this point we are $2.1 million apart." Baptist Hospitals told Aetna that it wanted to continue on with the same contract as Memorial Hermann, just with lower reimbursement rates (per diems, case rates, and % of billed charges).

As a result, Baptist Hospitals countered with a proposal under which Aetna would continue paying Baptist at the Memorial Hermann rates for all services—including ██% of billed charges for high cost-drugs and implants—for the remainder of 2013 and then dropping to lower rates effective January 1, 2014 going forward, coupled with a ██% cap on increasing the Charge Master.[1] Ex. 1, at ¶ 13. When Baptist Hospitals modeled its counterproposal that used the Memorial Hermann rates for 2013 and the reduced "community hospital" rates proposed by Aetna for 2014 going forward—including ██% of billed charges for high-cost drugs and implants—there was still a significant reduction in revenue but it was more spread out over time and easier for Baptist Hospitals to accept as part of a negotiated compromise. *Id.*

23.     In all of the negotiations, phone calls, and meetings between Aetna and Baptist Hospitals, the parties always discussed compensation for high-cost drugs and implants in terms of a flat percentage of billed charges, either ██% of billed charges (the Memorial Hermann rate) or ██% of billed charges (the "community hospital" rate). Ex. 1, at ¶¶ 15-16. There was no discussion or negotiation about a limit on the amount that could be charged for high-cost drugs and implants other than the Charge Master protection built into the contract. *Id.* All of Baptist Hospitals' modeling of the projected financial performance of the contract used either ██% of billed charges or ██% of billed charges for high-cost drugs and implants. *Id.*

C.  **Aetna Agrees to Pay Baptist Hospitals at the Same Memorial Hermann Rates for the Rest of 2013—Including ██% of Billed Charges for High-Cost Drugs and Implants—and at Lower "Community Hospital" Rates Starting in 2014, Including ██% of Billed Charges for High-Cost Drugs and Implants**

24.     On April 5, 2013, Lucia Herrera of Aetna called Roy Bush of Baptist Hospitals and told him that Aetna had agreed to "extend the current rates until 1/1/2014" and then "the new

---

[1] Hospitals maintain a master list of their charges for all procedures and services ("the Charge Master"). As the costs to provide procedures and services change, so does the Charge Master.

rates would be in place." *See* Ex. 1, at ¶ 14. That same day, Aetna sent Baptist Hospitals the final version of the negotiated contract, stating: "We have agreed to leave the 2 Baptist hospitals on their current compensation terms through 12/31/2013, with a new services and compensation effective 1/1/2014."

25. The parties executed that version of the contract on April 10, 2013, with an effective date of June 1, 2013 ("the Agreement"). The Compensation Schedule was structured the same way as the Memorial Hermann contract; that is, there are per-diem Inpatient Rates for intensive care, intermediate care, surgical care, rehabilitation care, etc. There are also Inpatient "Carve Out" Rates for services such as coronary bypass, maternity care, ambulatory surgery, emergency care, radiology services, etc. in which Aetna paid the hospital a specific per-diem rate, case rate, or a rate expressed as a percentage of the billed charges as an additional rate for specific procedures or services on top of the standard inpatient rates.

26. There are also carve-outs, just like in the Memorial Hermann contract. Under the Sections "Inpatient Carve Out Rates" and "Outpatient Carve Out Rates," the Agreement's Compensation Schedule effective June 1, 2013 states that Aetna will pay Baptist Hospitals for high-cost drugs and implants as follows, for all products (HMO, PPO, etc.):

| High Cost Drugs | Revenue Codes: 251-252, 636 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |
|---|---|---|
| Implants/Prosthetics/Orthotics | Revenue Codes: 274, 275, 276, 278 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |

This was the same rate schedule as the Memorial Hermann contract.

27. The Agreement also contained a Compensation Schedule effective January 1, 2014. Concerning high-cost drugs and implants, the "Inpatient Carve Out Rates" and "Outpatient Carve Out Rates" are stated as follows:

614022.2

| High Cost Drugs – Revenue Code- $2500 Threshold | Revenue Codes: 636 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |
|---|---|---|
| Implants/Prosthetics – Revenue Code - $2500 Threshold | Revenue Codes: 274, 275, 278 | ■% of Billed Charges Paid In Addition to Other Negotiated Rates |

28.     In other words, the compensation structure for high-cost drugs and implants was the same as before—Aetna would pay Baptist Hospitals a set percentage of billed charges for high-cost drugs and implants that met a defined threshold. All that changed was the percentage amount and the threshold amount, but otherwise the structure was the same as the Memorial Hermann contract.

**D. As the Parties Agreed, Aetna Pays Baptist Hospitals for High-Cost Drugs and Implants at ■% of Billed Charges for June 1, 2013 Through December 31, 2013, and Then at ■% of Billed Charges from January 1, 2014 Through the Present.**

29.     Aetna lived up to its end of the bargain with respect to high-cost drugs and implants, at least until Cotiviti and OmniClaim, Aetna's auditors, got involved. For all of 2013, Aetna paid Baptist Hospitals a flat ■% of billed charges for high-cost drugs and implants, with no adjustments or limitations based on the acquisition or invoice price of the drugs and implants. Ex. 1, at ¶ 17. From January 1, 2014 to the present, Aetna has been paying Baptist Hospitals a flat ■% of billed charges for high-cost drugs and implants, without regard to the invoice price of the drugs and implants. *Id.*

30.     Aetna's payments for high-cost drugs and implants since June 1, 2013 have been consistent with the Agreement's Compensation Schedule, the parties' negotiations leading up to the Agreement, and even with Aetna's payment history for the previous nine-plus years (February 2004 through May 2013).

614022.2

**E. Cotiviti, A Third-Party Auditor Working for Aetna, Comes Up with a New Interpretation of the Contract In Order to Claim that Aetna Has Been Overpaying on High-Cost Drugs and Implants Since 2013 and is Entitled to a Multimillion Dollar Refund, a Portion of Which Would Go to Cotiviti; OmniClaim Later Does the Same.**

31.     Cotiviti is a third party company that claims to be a "recognized leader in payment accuracy solutions for major healthcare payers in the U.S." Cotiviti asserts that its "experts dig into complex data streams to uncover financial opportunity in places that are hard for our clients to reach." According to Cotiviti, its "accuracy solutions" save insurance companies "more than $3 billion each year."

32.     In late 2015, Cotiviti contacted Baptist Hospitals to conduct an audit into Aetna's payments for high-cost drugs and implants. Cotiviti did not participate in the contractual negotiations or in the contractual relationship between Aetna and Baptist Hospitals. However, as part of an audit, Cotiviti took the position that Aetna had overpaid Baptist Hospitals by approximately $3.5 million because, according to Cotiviti, the parties did not agree to reimbursement for high-cost drugs and implants at ██% of billed charges for 2013 and ██% of billed charges for January 1, 2014 going forward. Ex. 1, at ¶ 18. Rather, Cotiviti claimed, the parties agreed to terms that are different than what is stated in the rate tables found in the Compensation Schedule. Cotiviti's interpretation is based on the presence of a section in the Agreement titled as follows:

**Implant Device and High Cost Drug Carve-Out Payment Terms and Conditions**

☐     **INPATIENT**          ☐     **OUTPATIENT**

33.     Although there are boxes to check to indicate whether the specific terms and conditions of this section would apply to high-cost drugs and implants provided on an inpatient basis, outpatient basis, or both, <u>no box is checked</u>. Ex. 1, at ¶ 19. This boilerplate section of the

Agreement goes on to state, inconsistent with the governing rate table, that Aetna will pay Baptist Hospitals "███████ percent (█%) of Hospital's eligible billed charges for the implant device(s) or high cost drug, provided that the payment does not exceed the Hospital's documented acquisition cost of the implant device(s) or high cost drug." It also states, inconsistent with the rate table, that "the mark-up for the implantable items, chemo drugs or high cost drugs billed with the above revenue codes shall not exceed █% of the invoice amount paid by Hospital for the implantable items, chemo drugs or high cost drugs."

34. Importantly, no one from Baptist Hospitals ever had any discussion with anyone from Aetna about these terms, and they were not part of any agreement between the parties. Ex. 1, at ¶ 16. This boilerplate provision, which does not have a box checked, does not apply to Aetna's payments to Baptist Hospitals for services rendered to Aetna's insureds.

35. As a third-party auditor working for Aetna, Cotiviti is likely compensated by Aetna on a contingent basis, i.e. some or all of Cotiviti's compensation is based on the amount of purported "overpayments" that Cotiviti helps payers like Aetna recover from healthcare providers like Baptist Hospitals.

36. In 2017, another third-party auditor hired by Aetna, OmniClaim, copied the Cotiviti interpretation of the parties' contract and also claimed that Aetna had overpaid Baptist Hospitals for high-cost drugs and implants.

**F. Cotiviti's New Interpretation is Not Supported by the Agreement, the Parties' Negotiations, or Aetna's Payments for the Last Three-Plus Years.**

37. Cotiviti's new view of the contract differs from what is stated in the Agreement, from how the parties negotiated the Agreement, and from how Aetna has paid Baptist Hospitals under the Agreement for many years.

38.     First, the rate tables in the compensation schedule are clear that Aetna is to pay Baptist Hospitals for high-cost drugs and implants at ██% of billed charges for 2013 and ██% of billed charges for 2014 and going forward. The rate tables do not mention acquisition cost or an allowable mark-up over invoice price. The section of the Agreement that Cotiviti relies on does not have a box checked for inpatient, outpatient, or both, and thus there is no indication that the parties intended for these provisions to apply as a limitation on payment, as Cotiviti now contends.

39.     Second, there was no negotiation between Aetna and Baptist Hospitals over payment terms for high-cost drugs and implants other than a flat ██% of billed charges and/or ██% of billed charges, limited only by the Charge Master provisions. See Ex. 1, at ¶¶ 15-16. As a result, when Aetna said that it had "agreed to leave the 2 Baptist Hospitals on their current compensation terms through 12/31/2013, with a new services and compensation effective 1/1/2014," Baptist Hospitals understood that to mean the high-cost drugs and implants would continue to be paid at ██% of billed charges (as they had been under the Memorial Hermann contract) and would be paid at ██% of billed charges starting January 1, 2014. Ex. 1, at ¶¶ 13-16. Aetna never mentioned anything to Baptist Hospitals other than a percentage-of-billed charges methodology for high-cost drugs and implants. *Id.*

40.     All of Baptist Hospitals' modeling of the projected financial performance of the various contract proposals was done using ██% of billed charges and/or ██% of billed charges for high-cost drugs and implants, without regard to acquisition cost or the amount of mark-up over invoice. Ex. 1, at ¶ 11. If Aetna had insisted on paying high-cost drugs and implants at ██% of billed charges but capped at the "documented acquisition cost," Baptist Hospitals would never have agreed to the proposal. *Id.*, at ¶ 19. Moreover, if Aetna had insisted on decreasing

the payments for high-cost drugs and implants to be capped at the acquisition cost (making these items essentially a pass-through), then Baptist Hospitals would have negotiated for higher base rates for the per diems and case rates, etc. *Id.* Baptist Hospitals did not because Aetna never mentioned much less insisted on such a provision. Cotiviti's new interpretation of the Agreement was not negotiated, modeled, or even discussed between the parties at any time.

41.     Finally, consistent with the rate tables and with Baptist Hospitals' agreement and understanding of the Agreement, Aetna has paid for high-cost drugs and implants at a flat percentage of billed charges, ■% for June 1, 2013 through December 31, 2013 and ■% for January 1, 2014 through the present, a period of over four years. Ex. 1, at ¶¶ 17, 21. Until Cotiviti got involved, Aetna interpreted the Agreement in the same way as Baptist Hospitals.

## V. CAUSE OF ACTION

42.     Baptist Hospitals incorporates paragraphs 1-41 as if stated verbatim herein.

43.     Aetna has breached the Agreement by demanding and obtaining a "refund" of amounts that were properly billed to and paid by Aetna under the terms of the Agreement for years.

44.     Baptist Hospitals seeks the equitable remedy of specific performance, requiring Aetna to abide by the contract and its terms and refrain from demanding or obtaining any further "refunds" of purported overpayments related to high-cost drugs and implants based on Cotiviti's new interpretation of the contract.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

45.     Baptist Hospitals incorporates paragraphs 1-41 as if stated verbatim herein.

46.     Under Chapter 65 of the Texas Civil Practice and Remedies Code, this Court has the authority to enter a temporary restraining order and, on further hearing, a temporary

13

injunction to restrain and enjoin Aetna from improperly recouping alleged overpayments by withholding payments for medical services that have been provided by Baptist Hospitals over which there is no dispute.

47.    Baptist Hospitals is entitled to a temporary restraining order and temporary injunction because if Aetna is not enjoined then Baptist Hospitals will suffer imminent and irreparable harm.

48.    The harm is imminent because Aetna has begun withholding payments.

49.    The harm is irreparable because Baptist Hospitals is a non-profit entity and the loss of Aetna's reimbursements for current, valid services will harm Baptist Hospitals' daily operations as a non-profit organization.

## VII.   CONDITIONS PRECEDENT

50.    All conditions precedent to recovery by Baptist Hospitals have been satisfied or have been frustrated by Aetna.

## VIII.   CONCLUSION AND PRAYER

51.    Due to Aetna's wrongful conduct, Baptist Hospitals respectfully seeks the following:

    a.  An order requiring specific performance by Aetna;

    b.  A temporary restraining order, temporary injunction, and permanent injunction prohibiting Aetna from recouping properly-made payments;

    c.  All other relief to which it may be entitled.

614022.2

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.


*/s/ Jeff Potts*
    Jeff Potts
    State Bar No. 00784781
    Jarod R. Stewart
    State Bar No. 24066147
700 Louisiana, Suite 2300
Houston, Texas 77002
713/221-2300 - telephone
713/221-2320 – fax


STRONG PIPKIN BISSELL & LEDYARD, LLP


*/s/ Greg M. Dykeman*
Greg M. Dykeman
State Bar No. 06325100
595 Orleans, Suite 1400
Beaumont, TX 77701
Tel: (409) 981-1120
Fax: (409) 981-1010
gdykeman@strongpipkin.com

**ATTORNEYS FOR BAPTIST HOSPITALS OF SOUTHEAST TEXAS**

614022.2

# EXHIBIT 1

CASE NO. _____

| BAPTIST HOSPITALS OF SOUTHEAST | § | IN THE DISTRICT COURT OF |
|---|---|---|
| TEXAS, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| AETNA HEALTH INC. | § | |
| | § | |
|     Defendant. | § | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF ROY BUSH

BEFORE ME, the undersigned official, on this day appeared Roy Bush, who is personally known to me, and first being duly sworn to law upon his oath deposed and said:

1.    My name is Roy Bush. I am fully competent to make this Affidavit, and all statements herein are within my personal knowledge and are true and correct.

2.    I am Director of Managed Care and Materials Management for Baptist Hospitals of Southeast Texas ("Baptist Hospitals").

3.    Due to their affiliation with Memorial Hermann Health System, for many years Baptist Hospitals were included as "participating providers" in the managed care contract between Memorial Hermann and Aetna Health Inc. ("Aetna"). As a result, Aetna paid Baptist Hospitals at the Memorial Hermann negotiated rates for healthcare services provided to Aetna's insureds.

4.    Under the Memorial Hermann contract with Aetna, as part of many different negotiated rates, the agreed-upon rate for high-cost drugs and implants was ■% of the hospital's billed charges. Thus, Aetna paid Baptist Hospitals ■% of its billed charges for high-cost drugs and implants provided to Aetna's insureds from February 2004 through May 2013 under the Memorial Hermann contract.

5.     In the summer of 2012, Baptist Hospitals received notice from Memorial Hermann that they would be negotiating a new contract with Aetna and that it would not include Baptist Hospitals. As a result, I knew that we needed to negotiate a direct contract with Aetna or we would go out of network and Aetna's insureds would have to pay more for healthcare services at Baptist Hospitals or would seek treatment somewhere else within Aetna's network.

6.     The negotiators for the new contract on the Aetna side were Lucia Herrera and Deborah Restum, while the negotiators on the Baptist Hospitals side were me and George Hill, who was Senior Vice President of Revenue Integrity for Community Hospital Corporation, the parent company for Baptist Hospitals. Although much of the communication was with Ms. Herrera, she always needed Ms. Restum's approval for any changes to any proposal or agreement.

7.     In September 2012, Ms. Herrera sent me an initial contract proposal. Based on my conversations with Ms. Herrera, I understood that Aetna wanted to have a separate contract with Baptist Hospitals, no longer on the Memorial Hermann contract, effective January 1, 2013. After receiving this proposal, we modeled the projected financial performance of Aetna's proposed contract for 2013. I informed Ms. Herrera that Aetna's initial proposal was not acceptable because the modeling showed there would be a $4.8 million reduction in revenue at Aetna's proposed new rates. I told Ms. Herrera that "[t]here is no way that we will agree to that large of a reduction."

8.     As a result, we made a counterproposal in which Baptist Hospitals would sign a separate agreement with Aetna effective January 1, 2013 but at the then-current rates, i.e. the Memorial Hermann rates. Mr. Hill and I communicated that position to Aetna on several subsequent occasions, including in November 2012.

9.     We did not receive a response from Aetna to our counterproposal until March 2013. There was little or no communication from Ms. Herrera and Ms. Restum in December 2012, January 2013, and February 2013, likely because they were devoting their time and attention to negotiating a new contract with Memorial Hermann. Around February 4, 2013, I learned from Memorial Hermann that they had reached a new agreement with Aetna that would become effective June 1, 2013 and that would no longer include Baptist Hospitals as a participating provider.

10.    Aetna's first response to our November 2012 counterproposal came on March 5, 2013. At that time, Ms. Herrera told me and Mr. Hill that an agreement needed to be reached within 20 days (by March 25) or the contract termination process would begin. Since there had been so little communication since November 2012, Mr. Hill asked Ms. Restum to schedule periodic calls so that we could work together toward the goal of signing a new contract in time for an effective date of June 1, 2013. Six days later, Ms. Restum responded that she agreed phone calls would be helpful because of the timeline and would set them up.

11.    Again, Baptist Hospitals modeled the projected financial performance of Aetna's latest proposal (March 5, 2013), and this time it showed a reduction in revenue of approximately $2.1 million. On March 15, 2013, Mr. Hill and I sent Ms. Restum and Ms. Herrera the results of the modeling and responded that their latest proposal was not acceptable. Mr. Hill told them that Baptist Hospitals was willing to work with Aetna to reach an acceptable contract, but that Aetna's latest proposal would not work.

12.    Over the next few weeks, Mr. Hill and I had several phone calls and meetings with Ms. Herrera and Ms. Restum about the contract and the proposed rates. We reiterated that Baptist Hospitals wanted to stay in Aetna's network on the Memorial Hermann rates, while

Aetna insisted that it needed to move us to much lower "community hospital" rates. Mr. Hill and I knew that moving to those new rates would generate a significant reduction in compensation (over $2 million) so we discussed ways to mitigate that reduction, including spreading out the reduction over two years instead of over a single year. We continued negotiations with Aetna and made a proposal that would spread out the reduction.

13. Ultimately, we reached a compromise with Aetna in which they agreed to sign a separate contract that would keep us on the same rates (i.e. Memorial Hermann rates) for the rest of 2013 and move us to lower rates starting in January 2014. That compromise allowed us to spread out the reduction in revenue over a longer time period, allowing Baptist Hospitals to better absorb the loss of revenue associated with the new Aetna contract.

14. In early April 2013, Ms. Herrera and Ms. Restum made clear to both me and Mr. Hill that Aetna had agreed to leave Baptist Hospitals on its current compensation terms for the remainder of 2013 and would move to lower rates starting January 1, 2014.

15. With respect to high-cost drugs and implants, the discussions and negotiations centered on the percentage-of-billed-charges methodology and what the appropriate percentage would be. Ms. Herrera and Ms. Restum ultimately agreed to Aetna continuing to pay ██% of billed charges for the remainder of 2013 because that was the Memorial Hermann rate. They agreed to reimbursement at ██% of billed charges starting in January 2014 because that was the lower rate that Aetna wanted going forward.

16. No one involved in the contract negotiations—not myself, not Mr. Hill, not Ms. Herrera, and not Ms. Restum—ever talked about changing the methodology for paying for high-cost drugs and implants from how it had been done on the Memorial Hermann contract. In all of the meetings, phone calls, and other discussions before the contract was signed, we only talked

4

about Aetna paying for those items at a percentage of billed charges, with increases in billed charges limited only by the Charge Master provisions in the contract. Based on our discussions with Ms. Herrera and Ms. Restum and my review of the final signed contract effective June 1, 2013, I understood that Aetna was going to continue paying Baptist Hospitals for high-cost drugs and implants at ██% of billed charges through December 31, 2013 and then at ██% of billed charges from January 1, 2014 forward, capped by a ██% annual Charge Master increase.

17.     Aetna did pay and has paid Baptist Hospitals for high-cost drugs and implants at the agreed-upon rates of ██% of billed charges for 2013 and ██% of billed charges for January 1, 2014 going forward.

18.     However, through its third-party auditor Cotiviti Healthcare, Aetna now takes the position it did not agree to pay ██% of billed charges for 2013 and ██% of billed charges for 2014 going forward, based on an inapplicable section in the Compensation Terms and Conditions. That section states that Aetna would pay at the agreed-upon percentage of billed charges but that the payment could not exceed Baptist Hospitals' documented acquisition cost of the drug or implant device.

19.     Baptist Hospitals did not agree to such a provision and I do not believe that Aetna intended that either, since Aetna never mentioned it during the negotiations. The boxes for "Inpatient" and "Outpatient" are both left unchecked, meaning that the parties did not intend for these specific terms and conditions to apply to their agreement. If Aetna had insisted on checking one or both boxes for this type of limitation on the carve-out payments for high-cost drugs and implants, Baptist Hospitals would have either (1) rejected it out of hand and gone out of network or (2) negotiated for higher base rates in order to offset the reduction in revenue that would result from applying such an "invoice cost" limitation to these carve-out payments for

high-cost drugs and implants.

20.     At no time during 2013, 2014, or 2015, did Aetna (or Cotiviti Healthcare) claim that Aetna had overpaid Baptist Hospitals for high-cost drugs and implants due to a purported limitation on charges based on acquisition cost.  Consistent with our meetings, phone calls, discussions, negotiations, and the contract itself, Aetna paid Baptist Hospitals at ■% of billed charges for 2013 and at ■% of billed charges for 2014, 2015, and 2016.  The alleged "overpayments" claim was first raised by Cotiviti Healthcare in January 2016, and then by another Aetna-hired auditor, OmniClaim, in 2017.

21.     Aetna has paid, and continues to pay, for high-cost drugs and implants at ■% of billed charges, without regard for the acquisition cost.

22.     Aetna, through Cotiviti and OmniClaim, has alleged overpayments and demanded that Baptist Hospitals pay Aetna a total of $2,644,903.72.  Baptist Hospitals maintains that no overpayments occurred and has not paid Aetna the demanded amount.  In response, Aetna recently began withholding payment on new claims for reimbursement for healthcare services provided by Baptist Hospitals to Aetna insureds, as a means to seek recoupment of the previous alleged overpayments.

23.     Aetna's actions in withholding payment will cause probable, imminent, and irreparable injury to Baptist Hospitals in that Aetna's actions cause immediate and irreparable harm to Baptist Hospitals' daily operations as a non-profit organization.  The threatened loss to Baptist Hospitals, if Aetna is not restrained, greatly outweighs the harm, if any, to Aetna by imposition of a restraining order.

Further Affiant sayeth not.

_____
**Roy Bush**

**THE STATE OF TEXAS** §
§
**JEFFERSON COUNTY** §

BEFORE ME, the undersigned authority, on this day personally appeared Roy Bush, by me being duly sworn stated that the facts stated in the foregoing affidavit are true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME by the said Roy Bush on the 2nd day of July, 2018 to certify which witness my hand and seal of office.

_____
Notary Public, State of Texas

VICKY ANN HENDERSON
Notary Public, State of Texas
My Commission Expires
April 17, 2019

7